UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:05-CR-70 |
| | ) | |
| DION A. WALKER | ) | |

**FINDINGS OF FACT AND
REPORT AND RECOMMENDATION**

United States District Court Judge William C. Lee referred this matter to the undersigned Magistrate Judge (Docket # 43) to conduct a hearing and submit a Report and Recommendation regarding Defendant Dion A. Walker's Motion to Suppress Evidence (Docket # 23) and his Amended Motion to Suppress Evidence and to Dismiss Indictment (Docket # 28). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(d)(1)(I), the Magistrate Judge recommends that Walker's motions to suppress evidence and to dismiss the indictment be DENIED based on the following facts and principles of law.

**I. PROCEDURAL BACKGROUND**

Following his arrest on November 30, 2005, Walker was charged in an indictment with two counts of possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and a third count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Docket # 14.) On February 17, 2006, Walker filed a "Motion to Suppress Evidence" (Docket # 23), and on April 10, 2006, he filed an "Amended Motion to Suppress Evidence and to Dismiss Indictment." (Docket # 28.) Walker contends that the evidence obtained in the search subsequent to his arrest should be suppressed because police officers lacked probable cause to arrest him. He also argues that the indictment should be dismissed because the alleged misconduct of police detectives in using Jafus Fields as a confidential informant ("CI")

violated the due process clause of the Fifth Amendment.

The Magistrate Judge conducted an evidentiary hearing on June 30, 2006. (Docket # 51.) Following the hearing, the Government filed its "Brief Supporting Denial of Amended Motion to Suppress Evidence and to Dismiss Indictment" on July 31, 2006, (Docket # 57), with Walker filing his "Brief in Support of Amended Motion to Suppress Evidence and to Dismiss Indictment" on August 23, 2006. (Docket # 60.) The Government then replied on August 30, 2006. (Docket # 61.)

## II. FINDINGS OF FACT[1]

After Fields, who was on parole, was arrested for possessing cocaine in March 2005, Detective Mark Gerardot of the Fort Wayne Police Department ("FWPD") interviewed him to determine whether he could be used as a CI. (Tr. 201.) Fields indicated that he could buy drugs from people in the community, specifically naming Walker as well as other individuals. (Tr. 207.) Although Detective Gerardot and Fields contacted each other via telephone several times after the initial interview, Detective Gerardot decided not to "sign up" Fields as a CI, mainly because Detective Gerardot had other cases he was working on at that time (Tr. 202, 208-10.) During the course of their contact, Fields informed Detective Gerardot that he was on parole, but Detective Gerardot did not contact Fields's parole officer because he does not include parole officers "in the loop if [he] can help it." (Tr. 212.)

Although Fields's "maximum possible date" for release from parole was March 4, 2006, he was released early, on June 2, 2005, pursuant to a blanket discharge of parolees by the Indiana

---

[1] To the extent that additional findings of fact are in the Legal Analysis section of this Report and Recommendation they are hereby incorporated by this reference.

2

Department of Corrections. (Tr. 146.) Fields's parole officer, John Havert, was unaware of the March 2005 arrest, and he opined that Fields probably would not have been eligible for early release if he had known of the arrest. (Tr. 145-47.) Havert also indicated that parolees are usually not permitted to be CIs. (Tr. 147-48.)

On October 24, 2005, two detectives at the FWPD interviewed Fields after he voluntarily came into the police station to give information. (Tr. 53.) After Fields provided information about two individuals that Detective Chad Wagner was investigating, the detectives contacted Detective Wagner, who then conducted his own interview of Fields. (Tr. 54.) Although most of the information he provided to Detective Wagner was about the other two individuals, Fields also mentioned that he had dealt with Walker in the past, that they used to be very close, and that he could buy large quantities of drugs from Walker. (Tr. 54.) Detective Wagner recognized Walker as one of the "upper echelon of the narcotics dealers in Fort Wayne." (Tr. 56.) The next day, Detective Wagner signed up Fields as CI 1333 and made a "gentleman's agreement" to pay Fields as compensation for his work as a CI, unaware that Fields was arrested in March and had spoken with Detective Gerardot about working off that arrest. (Tr. 55-57, 106.) In fact, prior to signing Fields up as a CI, Wagner ran a computer check on him, which revealed no involvement with law enforcement. (Tr. 102.)

On November 2, 2005, Detective Teresa Smith of the FWPD received a telephonic tip from a female caller who wished to remain anonymous. (Tr. 7, 21.) The caller informed Detective Smith that Walker had just gotten out of federal prison and was dealing in kilogram quantities of drugs. (Tr. 7-8.) She further reported that Walker stashed the drugs at a house in his mother's name on the southwest side of Fort Wayne and that he stayed at the residence of the

mother of his child, Africa Milton, who lived on Werling, and at the residence of his girlfriend, Margaret Driver, who lived on Gaywood near Pettit. (Tr. 7; Ex. 1.) The caller also indicated that Walker drove multiple vehicles registered in other people's names, including a white Cadillac Escalade registered to Driver, a black BMW purchased from a person named Gorman, a tan Ford Taurus, and a black Chevrolet Caprice.[2] (Tr. 9-10.) According to the caller, Walker's cellular telephone number was 241-3174. (Tr. 10-11.)

Through record checks and investigation, Detective Smith identified the following addresses associated with the names the caller provided: 4830 Gaywood (Driver's residence); 4511 Werling (Milton's residence); 1741 Lough Nest, which is located in southwest Fort Wayne and titled in Walker's mother's name. (Tr. 8-9.) Through BMV checks, Detective Smith also verified the caller's information regarding the vehicles. (Tr. 15.) She ultimately concluded that the tip was credible. (Tr. 15, 20.)

A couple of days later, Detective Smith passed the tip on to Detective Wagner after he indicated that he knew of Walker and had a CI who had provided information about Walker to him. (Tr. 12, 16.) The tip triggered Detective Wagner's interest in making controlled buys from Walker, particularly since Detective Smith corroborated the information. (Tr. 54-55.)

On November 7, 2005, Detective Wagner supervised the first in a series of three alleged controlled buys from Walker, using Fields as the CI. (Tr. 57.) Prior to the first buy, Fields called a person, purportedly Walker, at the phone number provided by the tipster, and that person

---

[2] Detective Wagner testified that the use of multiple vehicles registered in other's names is suspicious because drug dealers often drive multiple vehicles to undermine surveillance and because registering vehicles in the names of others makes it more difficult to forfeit these assets. (Tr. 76.)

4

instructed Fields to go to "Frica's."[3] (Tr. 62-64.) A detective dropped off Fields one or two blocks from Milton's residence, and detectives maintained constant visual surveillance of Fields until he entered the residence. (Tr. 65-66.) A person, again purportedly Walker, arrived at Milton's in a pearl-colored Cadillac Escalade registered to Driver and Walker's grandmother, Edna Walker. (Tr. 67, 69-70, 73.) A detective confirmed that the driver of the Escalade was a "bigger" black male who fit Walker's description. (Tr. 69.)

Using Fields's body recorder, Detective Wagner heard a female voice greet Walker by saying, "What's up D?" and then heard money being counted. (Tr. 67-69.) After Fields left the residence, he provided detectives with a baggie containing 4 ½ ounces of powder cocaine, which he purchased from Walker for about $2,600. (Tr. 62-63, 67-68, 116.) Fields was then searched and debriefed, and his statements were corroborated by the body wire that he wore during the buy. (Tr. 68.) In addition, Fields positively identified Walker as the dealer via a photographic array. (Tr. 77, 118-19.)

After completing the sale, Walker left Milton's residence in the Escalade and drove an indirect route to 1741 Lough Nest, consistent with what Detective Wagner described as "cleaning," which occurs when an individual who has just completed a drug transaction drives in such a way to ensure that he is not being followed by police. (Tr. 74-75.) Upon his arrival at 1741 Lough Nest, Walker pulled the Escalade into the driveway, opened the garage door, moved some vehicles around, and then left in a black BMW registered to Helen Craig, Driver's mother. (Tr. 71, 75-76.) Having previously viewed a photograph and description of Walker, the detective posted at Lough Nest observed that the individual appeared to be Walker. (Tr. 75.)

---

[3] "Frica" is Milton's nickname. (Tr. 64.)

At some point between the first and second buy, Detective Wagner was in the office talking with other detectives when Fields's name "came up." (Tr. 58.) Detective Gerardot overheard the conversation and indicated that he thought he had a case on Fields. (Tr. 58, 224.) After Detective Gerardot verified that he did indeed have a case on Fields, Detective Wagner arranged to have him work off the arrest by working as a CI on other investigations. (Tr. 58-59.)

On November 15, 2005, Fields arranged a second controlled buy from Walker. (Tr. 77.) Surveillance units were posted at the various addresses associated with Walker, and Detective Smith observed an individual fitting Walker's description and build exit Driver's residence shortly after one of Fields's calls to Walker. (Tr. 79-80.) That person then drove away in a tan Ford Taurus registered to Walker's brother, Charles Walker, and traveled to 1741 Lough Nest. (Tr. 79-80.) After Fields called Walker to request that half of the drugs be made into crack cocaine, Walker briefly left 1741 Lough Nest, possibly to get some things to turn the powder cocain into crack cocaine. (Tr. 80-81.)

Fields and Detective Wagner waited for Walker at the Best Buy parking lot near Jefferson Pointe, but Walker eventually called Fields to move the buy to the Burger King parking lot. (Tr. 79, 82.) Detective Wagner drove Fields to Burger King and parked about three or four parking spaces away from where the buy took place. (Tr. 84.) Detectives Wagner and Ray monitored Fields as he walked to the tan Ford Taurus, and Detective Wagner monitored the conversation between Fields and Walker on Fields's body recorder. (Tr. 83-85, 117-18.) After the transaction, Fields handed Detective Wagner two baggies, one containing 4 ½ ounces of compressed powder cocaine and the other containing 4 ½ ounces of crack cocaine, which Fields purchased for about $5,000. (Tr. 78, 85-86.) During the debriefing, Fields again confirmed that

Walker was the dealer. (Tr. 85.) After the sale, Walker returned to 1741 Lough Nest in the Taurus. (Tr. 86.)

On November 22, 2005, Fields performed a third controlled buy, allegedly purchasing 4 ½ ounces of powder cocaine and 4 ½ ounces of crack cocaine from Walker and attempting to purchase a "QP" (quarter pound) of "green" (marijuana). (Tr. 89.) There were more telephone calls made to 241-3174 to coordinate the deal, with Detective Wagner making one call in an undercover capacity. (Tr. 88-89.) With surveillance units in place, Detective Wagner drove Fields to the Burger King parking lot. (Tr. 90-91.) Walker drove the Taurus from the Lough Nest residence to Burger King, with Detective Wagner's vehicle and the Taurus parked only a few spaces apart. Detective Wagner viewed the driver of the Taurus, concluding that the driver's appearance was consistent with that of Walker. (Tr. 90-92, 124.) Over Fields's body recorder, Detective Wagner heard a conversation between Fields and Walker about Walker forgetting the "green."[4] (Tr. 91.) After the transaction, Fields gave Detective Wagner two separate baggies containing powder cocaine and crack cocaine. (Tr. 91.) During his debriefing, Fields again identified Walker as the dealer. (Tr. 92.) Detective Wagner viewed a video recording of the Taurus returning to 1741 Lough Nest after the buy and confirmed that the driver had Walker's appearance and was wearing the same clothes as the seller of the drugs. (Tr. 94.)

A fourth controlled buy was scheduled for November 30, 2005; Fields again called 241-3174 to set up the buy, ordering an "eighty" of powder cocaine, an "eighty" of crack

---

[4] On the various audio recordings taken during the course of the buys, Detective Wagner noted that the voice was the same and was very distinct. (Tr. 95.) FWPD Detective Jay Thompson, who dealt with Walker on a regular basis "years ago," listened to some of the audio recordings and viewed the video surveillance, concluding with 100% certainty that the suspect was Walker. (Tr. 95-96.)

cocaine, and the quarter pound of marijuana that Walker forgot to deliver at the third buy. (Tr. 99.) Detective Wagner then obtained a state search warrant for 1741 Lough Nest, and for safety purposes, he planned for Walker's arrest to take place inside the residence during the execution of the search warrant and prior to the actual buy. (Tr. 96-97, 127.)

At approximately 12:30 p.m., surveillance units advised that Walker was leaving 1741 Lough Nest in a blue Cadillac with license plate number 2JW464. (Tr. 26.) FWPD Detective Craig Wise observed Walker, the lone occupant, drive the Cadillac to a gas station, where he circled around the parking lot and then pulled up next to some gas pumps.[5] (Tr. 27.) The alleged Walker sat in the car for a while, looked around, and eventually placed a white plastic bag in a trash can. (Tr. 27.) He remained there for a few more minutes and looked around again before leaving. (Tr. 28.) Detective Wise retrieved the plastic bag from the trash can, which contained several kilo wrappers with white residue that later field tested positive for cocaine. (Tr. 30-31.)

At approximately 2:30 p.m., Detective Wise observed the blue Cadillac return to 1741 Lough Nest. (Tr. 31.) After briefly entering the residence, Walker attempted to leave in the Taurus but was arrested just after backing out of the driveway and entering the street. (Tr. 31, 128.) In the search pursuant to the arrest, FWPD detectives seized an eighty of powder cocaine, an eighty of crack cocaine, and a quarter pound of marijuana from the possession of Walker, items consistent with what Fields had ordered. (Tr. 98-99.) Immediately after Walker's arrest, a search of 1741 Lough Nest was conducted pursuant to the search warrant. (Tr. 133.)

---

[5] Because of the distance, Detective Wise was unable to positively identify Walker, but based upon his investigations of Walker ten years ago, he concluded that the driver had the same characteristics and build as Walker. (Tr. 28-29, 34-35.)

### III. LEGAL ANALYSIS

Walker seeks two forms of relief. First, he contends that the evidence seized in the search pursuant to his arrest should be suppressed because the police lacked probable cause to arrest him, thus violating his Fourth Amendment rights. Second, he asks that the Court dismiss the indictment against him because the alleged misconduct of the police violated the Due Process Clause of the Fifth Amendment. These arguments will be discussed in turn.

### A. Walker's Fourth Amendment Claim Fails Because the Police Had Probable Cause to Arrest Him

Walker first argues that the evidence seized pursuant to his arrest should be suppressed as fruit of the poisonous tree because the police lacked probable cause to arrest him. *United States v. Swift*, 220 F.3d 502, 506-07 (7th Cir. 2000). Pursuant to the Fourth Amendment's protection "against unreasonable searches and seizures," U.S. Const. amend. IV, an officer may legally arrest a suspect without obtaining an arrest warrant beforehand only if the officer has probable cause to arrest. *United States v. Sawyer*, 224 F.3d 675, 678 (7th Cir. 2000). Furthermore, if the arrest was legal (e.g., the officer had probable cause to arrest), the officer is permitted to conduct a full search of the arrestee "to discover weapons the arrestee might be carrying and to preserve evidence that might be destroyed." *Id.* (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973); *United States v. Rodriguez*, 995 F.2d 776, 778 (7th Cir. 1993)).

Probable cause exists "when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *Id.* at 678-79 (citing *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995); *United States v. Levy*,

9

990 F.2d 971, 973 (7th Cir. 1993)). Probable cause, however, does not require the officer to have evidence sufficient to support a conviction, nor is the officer even required to demonstrate that it is more likely than not that the suspect committed a crime. *Id.* at 679 (citing *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir. 1992)). Instead, "[as] long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *Id.* (citing Levy, 990 F.2d at 973).

Walker's first challenge to the determination of probable cause centers on the telephone tip, which sparked Detective Wagner's interest in conducting controlled buys between Fields and Walker. Walker claims the tip provided no specific, verified, or corroborated information and was nothing more than innocuous information about people connected to Walker through personal and family ties, and ended with the general comment that Walker was dealing drugs. *See United States v. Huebner*, 356 F.3d 807, 813-14 (7th Cir. 2004) (quoting *United States v. Navarro*, 90 F.3d 1245, 1253 (7th Cir. 1996) ("[A] court must 'consider the informant's information–in amount and in degree of reliability–and the degree of corroboration of that information by the officers.'"). Walker also questions the propriety of Detective Wagner relying on a tip from an anonymous caller whose reliability could not be established. *See Gilbert*, 45 F.3d at 1166 (opining that a tip can provide the basis for probable cause "as long as the tip is reliable").

Contrary to Walker's contentions, however, the caller provided numerous specific details regarding Walker. For example, she listed three residences associated with Walker and his drug activities: Milton's on Werling, Driver's on Gaywood near Pettit, and a stash house in his mother's name located on the southwest side of Fort Wayne. Furthermore, the caller reported

10

that Walker drove a tan Taurus, a white Escalade, and a black BMW, all of which were registered in other people's names.[6] Finally, the caller provided Walker's cell phone number. This information was verified by Detective Smith and later corroborated by other detectives when conducting the controlled buys, thus increasing the caller's reliability regarding Walker's drug dealing. *See Alabama v. White*, 496 U.S. 325, 329 (1990) (citing *Gates*, 462 U.S. at 244) ("Because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity."); *Huebner*, 356 F.3d at 813-14; *Gilbert*, 45 F.3d at 1166 ("[The tipster's] [r]eliability may be shown . . . through independent confirmation or personal observation by the police . . . ."). Furthermore, detectives did not rely solely on the anonymous tip to provide them with probable cause to arrest Walker; instead, the police further enhanced the caller's reliability by conducting three controlled buys and arranging a fourth buy before arresting him. *See Huebner*, 356 F.3d at 813-15.

In that regard, controlled buys are an effective way to establish probable cause against a suspect. *See United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) ("Generally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity."); *United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998); *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996). Walker, however, attacks the FWPD's investigative techniques, specifically contending that the use of Fields to conduct controlled buys was improper because

---

[6] This seemingly innocuous information is pertinent to the probable cause inquiry because Detective Wagner indicated that drug dealers often use multiple vehicles registered in other people's names to circumvent surveillance and forfeiture. *See Huebner*, 356 F.3d at 814-15 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)) ("[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts.").

11

he was not a reliable or credible informant.[7] Walker characterizes Fields as a criminal and a liar who failed to report to Detective Wagner that he had been arrested in March and had subsequently spoken to Detective Gerardot about working off the arrest.[8]  However, police do not always have the luxury of a "tried and true informant,"[9] and Fields's omission pales in comparison to the track record of reliability he established through the three controlled buys and the ongoing fourth buy. *United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998) (opining that controlled buys boost an informant's reliability). By focusing solely on Fields's omission, Walker improperly rests his argument on a few isolated facts rather than the totality of the circumstances. *Sawyer*, 224 F.3d at 679 (opining that the probable cause determination should be based on the totality of the circumstances).

---

[7] When examining officers' use of a CI to establish probable cause to arrest, courts should consider the CI's reliability, veracity, and basis of knowledge, together with police corroboration of the CI's information. *Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir. 1995); *Wilson v. Blaker*, No. 4:05-cv-6-WGH-DFH, 2006 WL 2326995, at *6 (S.D. Ind. Aug. 9, 2006) (citing *Gates*, 462 U.S. at 213). Walker contends that in addition to these factors, the Court should consider Fields's failure to testify at the evidentiary hearing, citing *United States v. Johnson*, 289 F.3d 1034 (7th Cir. 2002), in support of his proposition. The *Johnson* Court, however, considered Walker's proffered factor in a different context–whether there was probable cause to issue a *search warrant*. *Id.* at 1038-39. In that context, the informant's testimony at a probable cause hearing allows the judge to assess the informant's reliability and credibility *before* deciding whether there is probable cause. An informant's testimony at an evidentiary hearing held after an arrest would be of questionable assistance in the probable cause determination, since officers are required to have probable cause at the time the arrest was made and cannot rely upon additional evidence uncovered after the fact. *See Smith v. Ball State Univ.*, 295 F.3d 763, 769-70 (7th Cir. 2002) (noting that the probable cause analysis is an *ex ante* test). Regardless, Fields's failure to testify has little impact on his reliability, given the high level of police surveillance and corroboration, which boosted Field's reliability.

[8] Walker also contends that Fields lied by failing to tell Detective Wagner that he was on parole; however, Fields had been discharged from parole in June, months before he spoke to Detective Wagner. Furthermore, Walker argues that the investigation of him actually began in March, after Fields spoke to Gerardot, and that police hid Fields's involvement as a CI until after his release from parole. Walker fails to explain how this claim pertains to Fields's reliability or the probable cause determination; instead, this claim relates to alleged police misconduct, a topic we will cover *infra*.

[9] In fact, a CI who was a model citizen would probably have been little use to police in their investigation of Walker, as Detective Wagner testified that an upper echelon drug dealer like Walker generally will only sell to someone from the drug world with whom he is familiar. *See United States v. Finley*, 705 F. Supp. 1297, 1300 (N.D. Ill. 1988) (noting that "the informants used will, of necessity, rarely be model citizens").

Walker further criticizes the investigation leading up to his arrest by claiming that the sole basis for establishing probable cause against him was the debriefing statements of Fields. Walker's argument, however, utterly ignores the extensive police surveillance that took place here. For example, police monitored the telephone calls between Fields and Walker and maintained constant visual surveillance over both men throughout the course of the drug transactions. In addition, body recorders were placed on Fields's person so that officers could listen to the conversations between Fields and Walker.

Although Walker contends that the police were unable to positively establish his identity, probable cause does not require certainties; rather, probable cause is a common sense determination based on the totality of the circumstances. *See Sidwell*, 440 F.3d at 869 (rejecting the defendant's argument that because police were unable to see the CI after he entered an apartment, the CI could have bought drugs from any person in any unit of the apartment building); *Sawyer*, 224 F.3d at 679. Here, common sense dictates that the police had probable cause to believe that Walker had sold drugs to Fields on three separate occasions and was about to sell to Fields a fourth time. Throughout the course of the surveillance, numerous detectives reported that the suspect matched Walker's description. In addition, the telephone number that the tipster gave as Walker's number was used to arrange each of the controlled buys. The distinct voice on the other end of the line was the same every time, and a detective familiar with Walker's voice was 100% certain that the voice belonged to Walker.

Furthermore, the tipster specifically listed three residences and three vehicles that were associated with Walker, and Detective Smith later confirmed this information. In fact, police observed Walker use the Lough Nest and Werling residences and the three vehicles in the course

13

of selling drugs to Fields. These vehicles and residences were all in the names of Walker's friends and relatives.[10] Under the totality of the circumstances, it is evident that Walker was the one common denominator in the controlled buys. Indeed, as the Government succinctly wrote, "all investigative roads led to Dion Walker." (Government's Reply Br. 7.)

Finally, Walker contends that the Government's failure to file criminal charges against him in connection with the three controlled buys provides evidence that the police lacked probable cause to arrest him. Walker supplies little explanation and no legal citations for his argument. Indeed, his claim is unusual given that the ultimate charging decision rests solely with the Government, whose ultimate decision could encompass factors that have little to do with whether police had probable cause.[11] *See, e.g.*, *United States v. Miller*, 458 F.3d 603, 604-05 (7th Cir. 2006) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)) (observing that United States Attorneys generally have "'broad discretion' to enforce the Nation's criminal laws").

### B. Walker's Fifth Amendment Claim Fails Because He Is Unable to Demonstrate That the Police Officers' Conduct Was Outrageous

Walker maintains that the indictment against him should be dismissed, arguing that the alleged outrageous conduct of the police violated his Fifth Amendment right to due process. The Seventh Circuit recently observed that although the Supreme Court "has left open the

---

[10] During the first buy alone, Walker arrived in a Cadillac Escalade registered in his girlfriend's and grandmother's names, and the sale occurred inside the residence of the mother of his child. After the transaction, Walker eventually drove to the Lough Nest "stash house" that was in his mother's name and drove away in a black BMW registered to his girlfriend's mother.

[11] For example, the Government points out that the amount of drugs found in Walker's pocket and in the Lough Nest residence with which he has been charged were sufficient by themselves to trigger a charge with a mandatory minimum of life imprisonment.

possibility" of such relief, the Seventh Circuit has "never taken what we see to be an extreme step of dismissing criminal charges against a defendant because of governmental misconduct." *United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006) (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)); *see also United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)) ("[T]he doctrine [of outrageous governmental misconduct] is moribund. . . . 'Stillborn' might be a better term, for it never had any life; and it certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine.")[12]

Walker proposes several theories of police misconduct that focus on the use of Fields as a CI. In his first theory, Walker contends that the FWPD hid Fields's involvement as a CI while he was still on parole, waiting to reveal Fields's participation only after his early release. In support of his argument, Walker cites to the testimony of Detective Wise, who stated that the investigation into Walker "probably" began a couple of months before Detective Smith received the telephone tip in November.[13] (Tr. 5.) We do not give any weight to this part of Wise's testimony since he could not remember exactly when the investigation of Walker began, an

---

[12] The Government maintains that pursuant to *Boyd*, the remedy that Walker seeks is unavailable. *See, e.g.*, *United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005); *United States v. Sherman*, 268 F.3d 539, 550 (7th Cir. 2001); *United States v. Lopeztegui*, 230 F.3d 1000, 1003 (7th Cir. 2000) ("[W]e have declined to recognize the doctrine of outrageous government conduct in a case involving alleged misconduct by law enforcement.") (emphasis omitted); *United States v. Garcia*, 89 F.3d 362, 367 (7th Cir. 1996) ("[O]ur circuit has expressly refused to recognize the doctrine of 'outrageous governmental conduct.'").

The Government's argument is well-taken, but regardless of whether the Seventh Circuit has completely shut the door to Walker's remedy or whether the door remains barely open, the fact remains that the Seventh Circuit has *never* dismissed an indictment due to governmental misconduct, thereby placing a formidable barrier in the way of Walker's claim for relief which he cannot overcome based on these facts.

[13] Walker also asks us to infer that Fields was working as a CI prior to October from the fact that no criminal charges were filed against him after his March arrest. Stated another way, Walker contends that if Fields was not working off his arrest for cocaine possession, then criminal charges would have been filed. However, as we discussed *supra*, the ultimate charging authority lies with the prosecuting authorities, not the police. *Miller*, 458 F.3d at 604-05.

understandable failing since his involvement in the case was peripheral. (Tr. 37-38.)

In contrast, Detective Wagner, who supervised the controlled buys, specifically remembered signing up Fields as a CI on October 25, 2005. In addition, Detective Wagner testified that his computer check revealed that Fields had not been signed up as a CI, that his interest in investigating Walker was triggered only after hearing about the November 2 telephone tip, and that the first controlled buy occurred on November 7. In light of this testimony, which the Court finds entirely credible,[14] it is evident that the police investigation of Walker did not begin until months after Fields was released from parole in June.[15]

Walker further contends that even if Fields was not signed up as a CI until October, the police engaged in misconduct, suggesting that it was improper to use Fields based on his criminal history. Using a CI with a criminal past, however, is hardly police misconduct; in fact, it is a common practice. *See Finley*, 705 F. Supp. at 1300 (rejecting defendant's argument that the use of an informant with a history of criminal convictions and possible involvement in murders necessitated dismissal and noting that "the informants used will, of necessity, rarely be model citizens").

---

[14] Magistrate Judges are permitted to make credibility determinations pursuant to a report and recommendation. *See Thomas v. Guardsmark, Inc.*, No. 02 C 8848, 2006 WL 59358, at *2 (N.D. Ill. Jan. 4, 2006) (citing *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995)).

[15] Even if the FWPD used Fields as a CI while he was on parole, we would not deem the conduct of the police as outrageous. *See United States v. Olson*, 978 F.2d 1472, 1481-83 (7th Cir. 1992) (rejecting defendant's outrageous government misconduct claim regarding the use of an informant on parole as mere "administrative error" that did not harm defendant's rights). In that regard, Walker cites to Detective Wise's testimony that he was not aware of any guidelines for police use of CIs who are on parole, asserting that Wise "seems to be saying that the individual officers are pretty much allowed to take whatever actions they want in regards to working with confidential informants." Wise, however, never indicated that officers were free to do whatever they pleased when using a CI. Furthermore, the lack of strict guidelines regarding the qualifications of confidential informants is far from outrageous, as CIs are, as we previously noted, usually not model citizens. In fact, Detective Wagner testified that the only way to determine whether a CI is qualified and reliable is to use the CI in controlled buys.

16

Walker also theorizes that the FWPD, particularly Detective Gerardot, encouraged untruthfulness by not reporting to Fields's parole officer that he had been arrested. However, it is difficult to connect this omission to a deprivation of Walker's due process rights, especially since the FWPD had not yet begun their investigation of Walker. *See United States v. Payner*, 447 U.S. 727, 737 n.9 (1980) (quoting *Hampton v. United States*, 425 U.S. 484, 490 (1976)) ("The limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant*.") (emphasis in original); *Olson*, 978 F.2d at 1481-83.

Finally, Walker cites to two more incidents of alleged outrageous misconduct, but provides little by way of explanation. First, he seemingly characterizes as "outrageous," Detective Smith's failure to obtain the identity of the anonymous tipster, but the record reflects that the caller wanted to remain anonymous, and in any event the anonymity of a tipster is more appropriately considered as a factor in the reliability analysis, which we discussed *supra*.

Walker also cites to the testimony of Vincent Harris, who claimed that Fields told him that he was afraid of Detective Gerardot and was being coerced by Detective Gerardot into being a CI against Walker. Of course, it is unlikely that Fields actually made this comment since Detective Gerardot did not use Fields as a CI. Moreover, the claim of alleged misconduct based on Harris's recounting of his conversations with Fields lacks probity because Harris is clearly a biased witness, going so far as to reveal in his testimony that he "would do whatever [he could] to help [Walker] out." (Tr. 161.) In fact, Harris frequently spoke with Walker on the telephone while Walker was in jail,[16] and per Walker's instructions, even accompanied Fields to the office

---

[16] These telephone calls were arranged by Harris's cousin and the mother of Walker's child, Africa Milton, who would "three-way" Harris and Walker. (Tr. 157-59.) Harris testified that he visited Milton once or twice a

of Walker's attorney so he could witness an interview between Fields and the attorney and report back to Walker. Therefore, Harris's biased testimony regarding Fields's alleged statements to him is not credible and is rejected.[17]

### IV. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge recommends that Walker's Motion to Suppress Evidence (Docket # 23) and his Amended Motion to Suppress Evidence and to Dismiss Indictment (Docket # 28) be DENIED. The Clerk is directed to send a copy of this Report and Recommendation to the Government and to counsel for Walker. NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. 28 U.S.C. § 636(b)(1)(C). FAILURE TO SERVE AND FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b); L.R. 72.1(d)(2).

SO ORDERED.

Enter for September 15, 2006

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge

---

week. (Tr. 158.)

[17] *See supra* footnote 14. It is also incongruous for Walker to argue, as he does in much of his brief, that Fields is a liar, but to embrace him when it comes to Fields's purported statement to Harris.